**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRANCEL BELLINGER *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 17-2124 (TJK) |
| MURIEL BOWSER *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs have filed suit against various District of Columbia public officials, alleging that they have unlawfully failed to provide Capitol View Library, which serves a predominantly black neighborhood, with the same renovations and related services provided to other public library branches that serve predominately white neighborhoods. Before the Court is Plaintiffs' Amended Motion for a Preliminary Injunction, which requests that the Court order Defendants to provide additional resources to Capitol View Library, make changes to its renovation plans, and enjoin its re-opening, which is scheduled for December 18, 2017. *See* ECF No. 19-1 ("Am. Mot."). There is little doubt that Plaintiffs are dissatisfied with the way in which Capitol View Library's renovation has proceeded. That is unfortunate, but it is not a basis to grant their motion. The Court finds that they are not likely to succeed on the merits of their claims here, nor will they suffer irreparable injury absent the injunctive relief sought. Moreover, the balance of the equities and the public interest weigh against the relief. Accordingly, Plaintiffs' motion is **DENIED**.

## I.    Background

### A.    Factual Background

The District of Columbia Public Library ("DCPL") is a free public library system that was created by Congress in 1896.  *See* ECF No. 24 ("Def. Opp.") at 2; D.C. Code § 39-101. DCPL is administered by a nine-member Board of Trustees, and consists of a central library and twenty-five branch libraries in neighborhoods throughout the District of Columbia.  Def. Opp. at 2; D.C. Code §§ 39-101, 39-104.  The central library and all branch libraries are open to all residents of the District of Columbia, regardless of the neighborhood in which they reside.  Def. Opp. at 30; D.C. Code § 39-103.  Capitol View Library is a DCPL branch library located in Ward 7 that serves a predominantly black neighborhood.  Am. Mot. at 3; Def. Opp. at 2. Decisions related to DCPL's capital and operations funding are made by the Mayor and the Council of the District of Columbia (the "Council") through the District of Columbia's annual budget process.  *See* Am. Mot. at 4; Def. Opp. at 3; D.C. Code § 39-106.

Since Fiscal Year ("FY") 2008, this process has authorized funding for renovations at eighteen full-service DCPL branch libraries throughout the District of Columbia.  *See* Def. Opp. at 3.  Renovations for two additional DCPL branch libraries were separately funded through another budget mechanism.  *Id.*  By early November 2017, renovations had been completed at fifteen of these DCPL branch libraries.  *Id.*  Five of these projects, including the renovation of Capitol View Library, are still in progress.  *Id.*

In the FY 2015 budget, Capitol View Library's renovation was initially allocated $10.5 million in funding, but that amount was reduced to $4.5 million in the FY 2016 budget due to the overall reduction of the DCPL capital budget.  Am. Mot. at 4; Def. Opp. at 5.  However, in the FY 2018 budget, the Council increased this project's funding to $7.2 million, by adding $2

million for "exterior improvements" and $700,000 "to provide an interim library space." Def. Opp. at 6. The project's overall budget has since increased to approximately $7.9 million, after DCPL added $726,000 to the project from other sources. *Id.*

Capitol View Library closed for interior renovations on February 25, 2017. *See* Am. Mot. at 3-4; Def. Opp. at 7. When libraries are closed for renovations, DCPL must determine whether it will provide interim library services for the community during the closure. *See* Def. Opp. at 4; ECF No. 27-7 ("Reyes-Gavilan Decl.") ¶ 3. Interim library services can range from placing DCPL librarians at other sites in the community—for example, at schools—to providing interim facilities capable of offering basic library services on a temporary basis. Reyes-Gavilan Decl. ¶ 4. DCPL considers the renovation's scope and budget when deciding whether to provide interim services, because the cost of those services comes out of the renovation's budget. *Id.* ¶ 5. When deciding whether to provide an interim facility as part of those services, DCPL also considers the length of planned closure and the library's proximity to other branches. *Id.* ¶ 6. DCPL generally provides an interim facility for library closures lasting longer than one year and where there is no other DCPL branch library within a mile. *Id.* In this case, DCPL provided interim services by assigning Capitol View Library staff members to nearby libraries, visiting neighborhood schools, and conducting outreach to daycare and early learning facilities. *See* Def. Opp. at 7; Reyes-Gavilan Decl. ¶ 7. DCPL attempted to open an interim library facility at a local church, albeit unsuccessfully. Reyes-Gavilan Decl. ¶ 7; *see* Am. Mot. at 7.

DCPL also commonly provides what is known as "opening day collection" funding for DCPL branches that re-open after being closed for renovation. *See* Def. Opp. at 4; Reyes-Gavilan Decl. ¶ 8. This funding is designed to cover the one-time costs associated with "refreshing" a library's existing collection. Reyes-Gavilan Decl. ¶ 8. Generally, the shorter the

closure, the less dated the materials are upon the library's re-opening, and the less "refreshing" its books and materials require. *Id.* ¶ 9. The amount of this funding is also tied to the number of items the specific library circulates. *Id.* ¶ 10. Capitol View Library, which circulated 33,416 items in FY 2015 and was scheduled for a nine-month closure, received an allocation of $50,000 for that purpose. *Id.* ¶ 11; Am Mot. at 9-10.

The interior renovations at Capitol View Library are now substantially complete. *See* Def. Opp. at 7. Accordingly, DCPL plans to re-open the library to the public on December 18, 2017. *Id.*; Reyes-Gavilan Decl. ¶ 13. Afterward, DCPL plans for Capitol View Library to undergo the design phase for exterior renovations, and to close the library again in the spring of 2018 to implement those renovations. Reyes-Gavilan Decl. ¶ 13. When Capitol View Library closes again, DCPL plans to open an interim library facility on the grounds of J.C. Nalle Elementary School, pursuant to an already-executed interagency Memorandum of Agreement. *Id.* ¶ 13; ECF No. 27-21.

## B. Procedural Background

Plaintiffs filed suit on November 6, 2017, and simultaneously filed a motion for a temporary restraining order and preliminary injunction. *See* ECF No. 1; ECF No. 4. On November 20, the Court held a teleconference with the parties and established a briefing schedule for Plaintiffs' anticipated amended motion for injunctive relief. On November 21, Plaintiffs filed an amended complaint. ECF No. 20 ("Am. Compl."). On November 22, they filed the amended motion for a preliminary injunction, mooting their original motion for a temporary restraining order and preliminary injunction. Am. Mot.

On November 29, Defendants Yvette Alexander, Vincent Gray, and David Grosso (the "Council Defendants") filed an opposition to Plaintiffs' amended motion and moved to dismiss

Plaintiffs' amended complaint.  *See* ECF No. 23-1 ("Cncl. Def. Opp.").  That same day,

Defendants Muriel Bowser, Richard Reyes-Gavilan, and Gregory McCarthy (the "Executive

Defendants") also filed an opposition to Plaintiffs' amended motion.  *See* Def. Opp.  On

December 7, Plaintiffs filed a reply to each of these oppositions.  *See* ECF No. 33 ("Reply to

Def. Opp."); ECF No. 34 ("Reply to Cncl. Def. Opp.").  On December 13, Plaintiffs filed a

notice attaching supplemental exhibits in support of their motion.  *See* ECF No. 37.  On

December 14, Executive Defendants moved to file a surreply.  *See* ECF No. 38 ("Def. Surrep.").

That same day Council Defendants filed a reply in support of their motion to dismiss, and the

Court held a hearing on the motion.  *See* ECF No. 39.  On December 15, the Court granted

Executive Defendants leave to file their surreply.

## II.    **Legal Standard**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008).  To warrant a preliminary injunction, Plaintiffs must establish that (1)

they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the

absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction

is in the public interest.  *Id.* at 20.  Historically, the D.C. Circuit has employed a "sliding scale"

test, whereby "[a] district court must 'balance the strengths of the requesting party's arguments

in each of the four required areas.'  If the showing in one area is particularly strong, an injunction

may issue even if the showings in other areas are rather weak."  *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *CityFed Fin. Corp. v. Office

of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)) (citation omitted).

After the Supreme Court's decision in *Winter*, however, the D.C. Circuit has suggested that a more stringent test may apply, and that the likelihood of success on the merits may be an "independent, free-standing requirement for a preliminary injunction." *Sherley v. Sebelius,* 644 F.3d 388, 393 (D.C. Cir. 2011) (internal quotation mark omitted). In light of the above, the Court employs the "sliding scale" framework to evaluate Plaintiffs' claims. Because Plaintiffs "cannot meet the less demanding 'sliding scale' standard, [they] cannot satisfy the more stringent standard alluded to by the Court of Appeals." *Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 241 (D.D.C. 2013).

## III. Analysis

The Court finds that Plaintiffs are not at all likely to succeed on the merits of their claims, nor will they suffer irreparable injury absent the injunctive relief sought. Moreover, the balance of the equities and the public interest weigh against the relief.[1]

---

[1] The Court acknowledges that Defendants have argued that (1) association plaintiffs Marshall Heights Civic Association and SE – NE Friends of the Capitol View Library lack standing and (2) all Plaintiffs lack standing for the claims against Council Defendants. *See* Def. Opp. at 13; Cncl. Def. Opp. at 12 n.11. While this Court recognizes that "a party who seeks a preliminary injunction 'must show a substantial likelihood of standing'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted), Defendants have not challenged that the individual plaintiffs have standing to sue the Executive Defendants, who are sued in their official capacities, which is the equivalent of a suit against the District of Columbia itself, *see Atchinson v. District of Columbia*, 73 F 3d. 418, 424 (D.C. Cir. 1996). Thus, the Court proceeds to evaluate whether Plaintiffs have shown a likelihood of success on the merits. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003) (collecting cases), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) ("Because only one plaintiff must have standing, we have no need to consider either the Navy's motion to dismiss certain retired and former chaplains from the appeal for lack of standing or whether the organizational plaintiffs have standing to pursue their claims.").

**A.      Likelihood of Success on the Merits**

**1.      Budget Autonomy Act (Count I)**

Plaintiffs allege that Defendants violated D.C. Code § 1-204.46(d), which was enacted as part of the Local Budget Autonomy Act of 2012 (the "Budget Autonomy Act"), D.C. Act 19-321 (2013), by "reprogramming" $700,000 that was allocated for interim library space for the communities served by Capitol View Library.  Am. Mot. at 8, 11-12; Am. Compl. ¶¶ 31-36.  The statute requires that, after the adoption of the annual budget for a fiscal year, "no reprogramming of amounts in the budget may occur unless the Mayor submits to the Council a request for such reprogramming and the Council approves the request" and certain other conditions are met.  D.C. Code § 1-204.46(d).

As a threshold matter, Plaintiffs have not demonstrated a likelihood of success on the merits on this count because it is unlikely that they have a private right of action to enforce the Budget Autonomy Act.  The relevant test to determine whether a D.C. statute creates an implied private right of action is set forth in *Cort v. Ash,* 422 U.S. 66 (1975).  *See, e.g.*, *Dial A Car, Inc. v. Transp., Inc.*, 132 F.3d 743, 744 (D.C. Cir. 1998).  In *Cort*, the Supreme Court stated:

> In determining whether a private remedy is implicit in a statute not expressly
> providing one, several factors are relevant.  First, is the plaintiff one of the class
> for whose *especial* benefit the statute was enacted—that is, does the statute create
> a . . . right in favor of the plaintiff?  Second, is there any indication of legislative
> intent, explicit or implicit, either to create such a remedy or to deny one?  Third,
> is it consistent with the underlying purposes of the legislative scheme to imply
> such a remedy for the plaintiff?

422 U.S. at 78 (internal quotation marks and citations omitted) (emphasis in original).  When dealing with statutes, such as this one, that do not expressly provide a private right of action, plaintiffs must meet a "relatively heavy burden of demonstrating that [the legislature]

affirmatively or specifically contemplated private enforcement when it passed the relevant statute." *Samuels v. District of Columbia*, 770 F.2d 184, 194 (D.C. Cir. 1985).

Although the issue was not briefed extensively by the parties, it does not appear that Plaintiffs are likely to meet this burden. The Budget Autonomy Act addresses the roles and responsibilities of the components of the District of Columbia's government in appropriating and spending local funds. *See generally* Budget Autonomy Act, D.C. Act 19-321 (2013). The law was passed by the Council to provide greater control over local funds by the District of Columbia, as opposed to Congress. Council of the District of Columbia, Committee of the Whole, Report on Bill 19-993, at 1-5 (Dec. 4, 2012). The specific provision cited by Plaintiffs is entitled "Enactment of local budget by council." D.C. Code § 1-204.46. And it is located in a subpart of the D.C. Code entitled "Budget and Financial Management." D.C. Code §§ 1-204.41– 1-204.53. Plaintiffs cite nothing that suggests that the law was passed to benefit a special class of persons, that the Council intended to create a private right of action when passing it, or that the underlying legislative scheme is consistent with such a right. Indeed, Plaintiffs do not even address the relevant legal standard. *See* Am. Mot. at 11-12; Reply to Def. Opp. at 5-6. They try to claim that the Declaratory Judgment Act, 28 U.S.C. § 2201, somehow obviates the need to demonstrate that the statute contains a private right of action. Reply to Def. Opp. at 5. But it is well settled that the Declaratory Judgment Act does not provide a private right of action; it only authorizes a form of relief. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).

Even if a private right to enforce it existed, however, Plaintiffs have still not demonstrated a likelihood that the law was in fact violated, because they fail to show that any funds have actually been—or even will be—unlawfully reprogrammed. Plaintiffs appear to allege that DCPL has not yet spent the $700,000 that has been allocated for interim services, Am.

Mot. at 11-12, and may never spend it. They further allege that DCPL may spend the funds on other community needs, citing a meeting on September 19, 2017, in which DCPL "presented a proposal that would give the community a choice between getting an interim service modular trailer by Jan/Feb 2018 or keeping the $700K and investing the funds in other ways," Am. Mot. at 8.

However, neither scenario suggests that a violation of the Budget Autonomy Act has occurred, or is even likely. First, the provision cited by Plaintiffs prohibits the unlawful reprogramming of funds, not failing to spend them. Second, under the law, if the referenced proposal were accepted by the community, the Mayor could then seek Council approval to reprogram the funds, consistent with and as contemplated by D.C. Code § 1-204.46(d), during the nine or so months remaining in FY 2018. In any event, DCPL's current intention is *not* to reprogram the funds, but to use them consistent with the purpose for which they were allocated: to open an interim library facility in a school in Plaintiffs' neighborhood when Capitol View Library closes in the spring. *See* Def. Opp. at 17-18; Reyes-Gavilan Decl. ¶ 13. The relevant officials have executed a Memorandum of Agreement to that effect. ECF No. 27-21. On this record, there is no basis for the Court to conclude that Plaintiffs are likely to demonstrate a violation of this statute.

### 2.     Equal Protection Clause (Count II)

Plaintiffs also allege that Defendants violated the Equal Protection Clause of the U.S. Constitution by discriminating against them on the basis of race when they failed to provide Capitol View Library with the same renovations and related services afforded to those public libraries serving predominantly white neighborhoods. *See* Am. Compl. ¶¶ 37-45; Am. Mot. at 12-17. The Equal Protection Clause applies to the District of Columbia through the Fifth

Amendment.  *See Dixon v. District of Columbia,* 666 F.3d 1337, 1339 (D.C. Cir. 2011); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

This claim requires a showing of intentional discrimination based on race.  "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977).  Discriminatory intent "implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation omitted).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arlington Heights,* 429 U.S. at 266.  To be sure, the Supreme Court has held that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."  *Id.*  However, the Court went on to hold that "such cases are rare.  Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence."  *Id.* (footnote omitted) (citing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

As part of this inquiry, the Court considers, among other things, (1) whether the impact of the action bears more heavily on one race than another; (2) the "historical background" of the decision, particularly if it demonstrates other actions taken for an invidious purpose; (3) any

departures from normal procedures; (4) any "substantive departures" from factors normally considered in reaching a decision; and (5) the administrative history of the decision. *Arlington Heights*, 429 U.S. at 266-68; *see also Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 171, 184 (D.D.C. 2014). On the entire record before the Court, Plaintiffs are not likely to succeed on this claim of intentional racial discrimination.

### a.    Alleged Library Renovation Budget Disparities

In seeking to demonstrate that Defendants engaged in intentional discrimination, Plaintiffs compare Capitol View Library's renovation budget to that of a single other branch library, Cleveland Park Library. They point out that Capitol View Library, which serves a neighborhood "cluster" that is 95% black and 1% white, had its renovation budget reduced from $10.5 million to $4.5 million in the FY 2016 budget. Am. Mot. at 3-4. Meanwhile, Cleveland Park Library, which serves an area that is 80% white and 4% black, had its renovation budget hold steady at $18.5 million. *Id.* But Plaintiffs fail to mention that in the FY 2018 budget, the Council increased Capitol View Library's renovation budget from $4.5 million to $7.2 million; DCPL then increased it by another $726,000, bringing the current renovation budget to approximately $7.9 million. *See* Def. Opp. at 6. The funding for Capitol View Library's renovation, then, has *increased* by over 75% since the time Plaintiffs seek to use as a point of comparison.

Even using up-to-date funding totals, however, this single library-to-library comparison selected from a larger program of many library renovations across the District of Columbia reveals next to nothing about whether Defendants have intentionally discriminated against Plaintiffs based on race. Moreover, expanding the library-to-library comparison beyond Cleveland Park Library to all five branch library renovation projects currently underway

significantly undercuts Plaintiffs' allegations of racial discrimination. For example, the current budget for Capitol View Library's renovation is virtually identical to (and in fact marginally greater than) that of Palisades Library, which Plaintiffs concede serves a neighborhood "cluster" that is 4% black and 80% white. *See* Def. Opp. at 21; ECF No. 24-6; Am. Mot. at 3. In addition, the branch library with the largest budget for an ongoing renovation—$20 million—is Lamond Riggs Library, located in Ward 5, which the 2010 census recorded as being 77% black. *See* Def. Surrep. at 6; ECF No. 24-6. Expanding the data set even further—to all branch library renovations completed over the last decade or so—the budget for Capitol View Library's renovation is *greater* than the budget that was allocated for Chevy Chase Library located in Ward 3, which the 2010 census recorded as being 5% black and 84% white.[2] *See* Def. Opp. at 21.

To be sure, these additional one-to-one library comparisons are of limited analytic value, as well. They do not, for example, account for non-racial differences among these renovation projects—such as the size of the library to be renovated and the number of items each circulates—that could explain funding disparities. They do, however, expose Plaintiffs' comparison between Capitol View Library and Cleveland Park Library as a cherry-picked example that provides scant evidence of discriminatory intent.

In addition, Plaintiffs argue that Capitol View Library's renovation budget is well below the average budget for a DCPL library renovation. Am. Mot. at 4. Again, standing alone, this fact—even if accurate—does not demonstrate intentional racial discrimination. There could be

---

[2] The Court takes judicial notice of 2010 Census results for Ward 3 maintained on the Government of the District of Columbia's Office of Planning website at: https://planning.dc.gov/node/597402. *See Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67-68 (D.D.C. 2014) ("[J]udicial notice may be taken of public records and government documents available from reliable sources."); Fed. R. Evid. 201.

many differences among these projects that explain why Capitol View Library's renovations have a lower-than-average budget. Plaintiffs allege nothing that would connect this departure from the mean to racial discrimination.

Finally, Plaintiffs cite a purported comparison of certain "funding streams" between libraries they identify as "east of the Anacostia River in predominantly African-American neighborhoods" and libraries elsewhere in the District of Columbia. Am. Mot. at 5. In response, Executive Defendants assert that over the course of the last decade, the District of Columbia's disproportionately black neighborhoods have, in the aggregate, received *above-average* funding for library renovations. Def. Opp. at 21. They attach exhibits that cite publicly-available information illustrating that libraries in Wards 7 and 8—the two wards "east of the Anacostia River"—received *more than* the per-ward average of approximately $28 million during that time.[3] *See* ECF No. 27-5; ECF No. 27-6. Capitol View Library, as noted earlier, is located in Ward 7. This is, once again, hard to square with intentional discrimination against them.

In response, Plaintiffs argue that the Court should adopt a "weighted average" approach that accounts for the number of libraries in each ward. Reply to Def. Opp. at 6. However, Plaintiffs do not indicate the source for the data they cite, and they employ an unclear and inconsistent methodology in making their calculations. In any event, their calculations are not illustrative of intentional racial discrimination. For example, it appears that they conclude that the ward with the *highest* per-branch library renovation funding is Ward 5,[4] which the 2010

---

[3] In their supplemental exhibits, Plaintiffs appear to challenge this figure, instead calculating the per-ward average as $31.7 million. *See* ECF No. 37-1. Even accepting it as accurate, the libraries in the two wards east of the Anacostia River *still* would have received higher than average funding. *See id.*

[4] This calculation excludes the budget for the renovation of DCPL's central library, the Martin Luther King Jr. Library, which is located in Ward 2.

census recorded as being 77% black. *See* ECF No. 33-2; Def. Surrep. at 6; ECF No. 37-2.

Plaintiffs' calculations do not come close to illustrating a "pattern as stark as that in *Gomillion* or

*Yick Wo*" from which, without additional evidence, the Court could infer racially discriminatory

intent on the part of Defendants.[5]

**b.     Alleged Interim Library Services Disparities**

Plaintiffs turn to other services connected with the Capitol View Library renovations to

demonstrate intentional racial discrimination. But Defendants supply non-discriminatory reasons

for their actions that effectively negate Plaintiffs' assertions of discrimination.

Plaintiffs claim that Defendants' failure to provide interim library services while Capitol

View Library was closed for renovation is further evidence of intentional discrimination against

them. *See* Am. Mot. at 3, 5, 6-9, 14; Def. Opp. at 23 n.13. They also assert, in a conclusory

fashion, that "the other libraries in the northwest quadrants of the city, and with significantly

more affluence and resources, were provided prompt interim services," including Georgetown

Library, Tenley Library, Cleveland Park Library, West End Library, and Mount Pleasant

Library. Am. Compl. ¶ 48.

In response, Executive Defendants assert that the decision to provide interim services is

affected by whether the renovation project's budget includes sufficient funding for those

services. Def. Opp. at 23; Reyes-Gavilan Decl. ¶ 5. So to some degree, Plaintiffs' argument

about interim services simply rehashes their unpersuasive argument concerning the size of

---

[5] For example, "[i]n *Gomillion* . . . a local statute altered the shape of a city from a square to a 28-sided figure, which had the effect of removing from the city all but four of its 400 African American voters, and not a single white voter." *In re Navy Chaplaincy*, 928 F. Supp. 2d 26, 34 (D.D.C.), *aff'd*, 738 F.3d 425 (D.C. Cir. 2013). And in "*Yick Wo* . . . a city board of supervisors denied building ordinance waivers to over 200 Chinese applicants, but granted waivers to all but one non-Chinese applicant." *Id.* Plaintiffs have shown nothing of the sort here.

various branch libraries' renovation budgets.  In any event, Executive Defendants explain that DCPL did in fact provide interim services by assigning Capitol View Library staff members to nearby libraries, visiting neighborhood schools, and conducting outreach to daycare and early learning facilities.  *See* Def. Opp. at 7; Reyes-Gavilan Decl. ¶ 7.

The real thrust of Plaintiffs' argument is that Defendants failed to provide an interim library *facility*.  But Executive Defendants provide non-discriminatory reasons for not providing such a facility.  They explain that whether an interim facility is provided by DCPL depends on the length of the library's closure and the library's proximity to other branch locations.  Reyes-Gavilan Decl. ¶ 6.  They concede that they generally provide an interim facility for library closures lasting longer than one year and where there is no other DCPL branch library within a mile.  *Id.*  But in this case, they assert, the budget for Capitol View Library's renovation project did not account for an interim facility, the library has been closed for less than ten months, and it is within a mile of Benning Library.  Def.  Opp. at 23.  Therefore, by their non-discriminatory criteria, the closing of Capitol View Library would not typically qualify for an interim facility.

Even so, Executive Defendants maintain, they tried to establish an interim facility in a nearby church, but the church turned down their proposal.  Reyes-Gavilan Decl. ¶ 7; *see* Am. Mot. at 7.  Moreover, when Capitol View Library closes again, DCPL plans to open an interim facility on the grounds of J.C. Nalle Elementary School, pursuant to an interagency Memorandum of Agreement that is already in place.  Reyes-Gavilan Decl. ¶ 13; ECF No. 27-21.  Finally, Executive Defendants cite numerous examples in which neighborhoods served by libraries in Ward 8 (Anacostia Library) and Ward 7 (Benning Library and Francis A. Gregory Library) that were closed for more than a year *received* interim library facilities, further undermining any claim of racial discrimination.  Def. Opp. at 23-24.

In their reply, Plaintiffs argue that the neighborhood served by Palisades Library, which will be closed for a similar amount of time, will get "more" interim library services—but do not elaborate further on the nature of these additional services. Reply to Def. at 8. And Defendants have proffered, and Plaintiffs have not disputed, that the Palisades Library will not receive an interim library *facility*—the clear focus of Plaintiffs' concern—because it will be closed less than a year. Def. Opp. at 24. In this critical respect, Palisades Library will be treated identically to Capitol View Library. Plaintiffs also rehash their allegation that it is somehow improper that the $700,000 allocated for interim services for Capitol View Library in FY 2018 has not yet been spent, but fail to explain the relevance of this allegation to their racial-discrimination claim. Reply to Def. at 8. Finally, they argue that Benning Library is in fact more than a mile away from Capitol View Library and is an unacceptable substitute library for that and other reasons. *Id.* Plaintiffs are clearly displeased with the interim services that DCPL has provided—and the interim facility it plans to provide—for their neighborhood during the Capitol View Library renovation process. But considered collectively, this evidence of record does not remotely suggest intentional racial discrimination.

### c.    Alleged "Opening Day Collection" Budget Disparities

Finally, Plaintiffs allege that Defendants failed to provide "opening day collection" funding for Capitol View Library commensurate with such funding for branch libraries that serve predominantly white neighborhoods. Am. Mot. at 9-10. Again, Plaintiffs rely heavily on a comparison with a single other branch: Cleveland Park Library. *Id.* Plaintiffs assert that Capitol View Library was allocated $50,000 for its "opening day collection," yet Cleveland Park Library was allocated $500,000. *Id.* Executive Defendants do not contest these funding amounts, but explain that, in general, this funding is tied to how long the library is closed: the longer the

closure, the more dated its materials are upon reopening, and the more "refreshing" of these materials is necessary. *See* Def. Opp. at 24; Reyes-Gavilan Decl. ¶ 9. In addition, the amount of this funding is tied to the number of items the specific library circulates. *See* Def. Opp. at 24; Reyes-Gavilan Decl. ¶ 10. Capitol View Library has been closed for ten months, and circulated 33,416 items in FY 2015. Reyes-Gavilan Decl. ¶ 11. Cleveland Park Library will be closed for two years, and circulated 207,376 items in FY 2015. *Id.* Therefore, the disparity in funding for these two libraries' "opening day collections" appears wholly explainable by factors other than invidious racial discrimination.[6]

Moreover, Executive Defendants note that, although Capitol View Library has relatively low circulation rates, it has a relatively high demand for computer technology. Reyes-Gavilan Decl. ¶ 12. Therefore, post-renovation, DCPL has included funding in its budget to increase the number of computers there to forty-four, more than double the current amount, and to hire additional staff to manage these computer services. *Id.* Also, Capitol View Library is slated to become the first renovated or rebuilt DCPL branch to feature a dedicated computer lab for public technology training. *Id.* Although Plaintiffs apparently favor a different mix of resources for Capitol View Library, it is hard to reconcile these notable improvements to their neighborhood library with intentional racial discrimination.

---

[6] Plaintiffs dismiss this explanation in their reply, and assert that these two libraries cannot be compared because of disparities in their collections that predate the renovations. *See* Reply to Def. Mot. at 9. But it was *Plaintiffs* who cited this comparison in support of their motion in the first place. Am. Mot. at 3-4, 9-10. Moreover, this lack of context further illustrates why the Court cannot conclude that any single library-to-library comparison cited by Plaintiffs is evidence of intentional racial discrimination.

### d. Other Potential Indicia of Intentional Racial Discrimination

Plaintiffs also attempt to address other criteria that the Supreme Court referenced as being potentially probative of discriminatory intent in *Arlington Heights*. Am. Mot. at 14-16. Again, they come up well short of the mark. Plaintiffs argue that library "funding patterns bear [a] historical dimension that tracks the development and gentrification across the city." *Id.* at 14. But development and gentrification are not at issue here, and this conclusory statement says nothing about the "historical background" related to the funding of DCPL's branch libraries, which, as discussed above, is not helpful to them.

Plaintiffs also contend that the "sequence of events" in securing funding for renovations at Capitol View Library has been "sporadic and piecemeal." *Id.* at 14. But Plaintiffs offer nothing beyond this conclusory statement, and fail to explain how this "sequence" was inconsistent with Defendants' usual practice. For instance, they repeatedly emphasize that Capitol View Library's capital improvements funding was cut by $6 million in the FY 2016 budget. *Id.* at 4; Reply to Def. Opp. at 2. But the funding for Palisades Library was also cut by $13.5 million in the same budget. Def. Opp. at 5-6. These reductions appear to have been made because "[t]he library, like all district agencies, was asked to absorb some reductions to its [FY 2016] budget to address a projected citywide shortfall of close to 200 million dollars." ECF No. 33-4, at 1.

Plaintiffs also allege that Defendants made a "substantial departure" from their "procedures" by not including enlarged windows in their planned renovations of Capitol View Library, as suggested in DCPL's "Building Program" for Capitol View Library's renovation. Am. Mot. at 6, 8-9, 15. However, the program expressly provides that it is intended to be used only "as a *guide*" and that the "requirements need to be adjusted to fit within the envelope of the

existing library while meeting the budget and adhering to all code required upgrades." Def. Opp. at 26 (quoting ECF No. 19, at 4) (emphasis in original). Plaintiffs' displeasure with the manner in which Capitol View Library's windows have been renovated is plain. But this change to the renovation plans does not represent a procedural departure at all, let alone one that is suggestive of discriminatory intent.[7]

Finally, Plaintiffs argue that "the administrative history of the project has not been transparent and remains inconsistent with the funding and planning of other DCPL libraries." Am. Mot. at 15. To a large extent, here Plaintiffs simply re-state claims advanced elsewhere, as well as recount their unhappiness with the renovation process for Capitol View Library. *See id.* at 15-16. They also allege that DCPL is violating a rule that branch library closures of ten months or more warrant interim library facilities, but they do not provide any evidence of such a rule. *See id.* at 16. Finally, they allege that in renovating Capitol View Library in the manner described, DCPL is violating its mission, as set forth in its strategic plan. *Id.* at 16-17. But it is difficult to comprehend how completion of this library renovation, even in light of the ways in which Plaintiffs are dissatisfied, is genuinely contrary to that mission.

In summary, none of these additional criteria demonstrate any evidence of racially discriminatory intent on the part of Defendants. As a result, Plaintiffs are not likely to succeed on the merits of this claim.

### 3. Substantive Due Process (Count III)

Plaintiffs also allege that their substantive due process rights under the Fifth Amendment were violated. Am. Compl. ¶¶ 46-50. The Due Process Clause of the Fifth Amendment to the

---

[7] Plaintiffs also contend that Defendants engaged in impropriety in connection with the contracting process. Am. Mot. at 15-16. But this claim is so vague and conclusory that it does not help Plaintiffs meet their burden.

U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  To succeed on a substantive due process claim, a plaintiff must prove "egregious government misconduct" that deprives him of a liberty or property interest. *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003).  Substantive due process "prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests." *Wash. Teachers' Union Local #6 v. Bd. of Educ. of D.C.*, 109 F.3d 774, 781 (D.C. Cir. 1997) (alterations in original) (quoting *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 943-44 (D.C. Cir. 1988)).  The standard also incorporates a "presumption that the administration of government programs" and "[d]ecisions concerning the allocation of resources" are "based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (alteration in original) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)).

Plaintiffs are not likely to be successful on this claim.  They do not have a constitutionally recognizable property interest in Capitol View Library's renovations and related services that are the focus of their lawsuit.  *See Boykin v. Gray*, 895 F .Supp. 2d 199, 220 (D.D.C. 2012) (holding that plaintiffs had no property interest in homeless shelter slated for closure).  And even if they did, as discussed above, they have not demonstrated conduct on the part of Defendants that comes close to the required showing of egregious government misconduct.  Rather, the conduct at issue in this case consists of run-of-the-mill decisions about how to allocate government resources, and as such is entitled to a presumption of rationality that Plaintiffs have not overcome.

### 4.    District of Columbia Human Rights Act (Count IV)

Finally, Plaintiffs allege that Defendants have violated the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq*., by discriminating against them on the basis of their place of residence.  *See* Am. Compl. ¶¶ 51-53; Am. Mot. at 19-20.  The DCHRA states in relevant part:

> Except as otherwise provided for by District law or when otherwise lawfully and reasonably permitted, it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: . . . place of residence . . . .

D.C. Code § 2-1402.73.  The DCHRA's "effects clause" states that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice."  *Id.* § 2-1402.68.  This "effects clause" imports into the DCHRA "the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)."  *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (parallel citations omitted); *see also 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 685 (D.C. Cir. 2006).  Accordingly, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason."  *Gay Rights Coal.*, 536 A.2d at 29.

On the record before the Court, Plaintiffs are no more likely to succeed on this claim than on the others, for reasons similar to those set forth in *Boykin*.  In that case, the district court dismissed a place-of-residence discrimination claim under the DCHRA based on the District of Columbia's closure of a homeless shelter in one neighborhood, while leaving similar shelters intact in other neighborhoods.  *See Boykin*, 895 F. Supp. 2d at 217-218.  The court concluded that:

> [I]t cannot be that Section 2-1402.73 is violated simply because the District closes a public assistance facility in one part of the city while failing to close similar facilities in a different part of the city. Under that reasoning, virtually any decision by the District limiting or restricting services of any kind in one quadrant, ward, or neighborhood could be challenged as discriminatory under the DCHRA. The same logic would seemingly allow individuals to sue over a failure to construct facilities or provide services in one part of the city where such facilities or services are available elsewhere. This broad interpretation, which would subject an unimaginable number of routine policy decisions to litigation, cannot credibly be derived from a provision that bars discrimination 'on the basis of' place of residence or eighteen other protected traits. . . . [T]he language of Section 2-1402.73 signals a focus on the selective denial of benefits to certain persons, based on their place of residence, while those benefits remain available to other persons. The conduct challenged here by the plaintiffs simply is not encompassed within that definition.

*Boykin*, 895 F. Supp. 2d at 218 (citation omitted).

The same is true here. There has been no "selective denial of benefits to certain persons" while those benefits remain available to other persons. *Id.* The entire DCPL system of branch libraries remains open to all residents of the District of Columbia, no matter the neighborhood or ward in which they live. *See* Def. Opp. at 30; D.C. Code § 39-103. Plaintiffs are therefore free to "request materials from, visit, and enjoy any library in the city," including two in Ward 7 (where Plaintiffs reside) and three in Ward 8, each of which was recently renovated. Def. Opp. at 30; *see* ECF No. 27-5. Moreover, to interpret the statute to encompass Plaintiffs' claims here would allow "individuals to sue over a failure to construct facilities or provide services in one part of the city where such facilities or services are available elsewhere . . . , subject[ing] an unimaginable number of routine policy decisions to litigation." *Boykin*, 895 F. Supp. 2d at 218; *see also Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 166-67 (D.D.C. 2014) (dismissing place of residence discrimination claim under the DCHRA based on the District of Columbia's construction of a facility in a particular neighborhood).

Finally, even assuming Plaintiffs' claims are cognizable under the statute, Defendants actions appear to be justified by non-discriminatory reasons.  As discussed at length above, it appears that renovations of various library branches in many different neighborhoods, including Capitol View Library, are being completed while taking into account budgetary restrictions, the characteristics of each library, and the needs of each neighborhood.  That is not to say, however, that all residents of each neighborhood necessarily agree with each of those policy decisions.

Plaintiffs point to *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33 (D.D.C. 2003), in support of their DCHRA argument.  But in that case, a taxi company was found liable because it was "significantly less likely to pick up a person requesting service from Anacostia than it [was] to pick up a person requesting service from another part of the city," resulting in a wholesale denial of benefits to certain persons there while those benefits remained available to others.  *Id.* at 49.  Nothing of the sort has occurred in connection with Capitol View Library's renovation.

## B. Irreparable Harm

The irreparable injury requirement sets a "very high bar" for a movant seeking a preliminary injunction.  *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  To be entitled to such relief, a plaintiff must show injury that is "certain, great, actual, and imminent."  *Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (citing *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Plaintiffs must show that the harm will "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674.  And the harm must be "beyond remediation."  *CFGC v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The availability of "adequate compensatory or other corrective relief" in the ordinary course of litigation "weighs heavily against a claim of irreparable harm."  *Va. Petrol. Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Plaintiffs do not come close to demonstrating the type of harm required to obtain a preliminary injunction. They allege that if an injunction does not issue they will suffer such harm as a result of (1) the lack of interim library services at Capitol View Library; (2) DCPL's purported failure to install, or to plan for, windows at Capitol View Library that are large enough to let in sufficient natural light; (3) the lack of funding for Capitol View Library's "opening day collection," and (4) a "noise disturbance" from using Capitol View Library when the library's exterior renovation occurs. Am. Mot. at 20-21.

Simply put, it is self-evident that none of these allegations even approaches the irreparable harm standard. Whatever harm might be suffered by Plaintiffs as a result of allegedly suboptimal interim library services, the library's window designs, or inadequate "opening day collection" funding for Capitol View Library is speculative and not of sufficient severity to warrant a preliminary injunction. *See Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 203-04 (D.D.C. 2015) (declining to hold that "a temporary closure of a park or recreation area" constituted irreparable harm). The same is true for any alleged "noise disturbance" that could result from the renovation of the library's exterior. *See City of Tempe v. FAA*, 239 F. Supp. 2d 55, 63 (D.D.C. 2003) (declining to find irreparable harm where plaintiffs did not establish that emissions from an airport runway project were "anything more than minimal"). In addition, the alleged lack of interim library services and concerns about noise disturbances in the library during its renovation cannot be the basis for any *imminent* harm at all. If the injunction does not issue, Capitol View Library, upon re-opening, will provide full services until the spring of next year, and no interim services will be necessary until then. Moreover, the library's external renovation is not planned to begin until the spring, at which time DCPL plans to close it. Reyes-Gavilan Decl. ¶ 13. Finally, there is no obvious reason why any of these harms, if later proven,

could not be the subject of adequate compensation or other corrective relief in the normal course of this litigation.

Plaintiffs appear to argue that they will suffer irreparable harm merely because some of these factual allegations are grounded in an alleged violation of the Equal Protection Clause. Am. Mot. at 21. But "merely raising a constitutional claim is insufficient to warrant a presumption of irreparable injury." *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013). And even assuming that all of Plaintiffs' factual—as opposed to merely conclusory—allegations are true, they do not sufficiently demonstrate irreparable injury on the record here. *See Incantalupo v. Lawrence Union Free Sch. Dist. No. 15*, 652 F. Supp. 2d 314, 330 (E.D.N.Y. 2009) (finding no irreparable injury for a First Amendment claim because the factual allegations plead were insufficient). At any rate, even assuming that every Equal Protection Clause allegation constitutes an irreparable injury, *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)), the other factors relevant for a preliminary injunction—the likelihood of success on the merits, balance of the equities, and public interest— weigh so heavily against Plaintiffs that they cannot prevail.

Finally, in their reply, Plaintiffs allege a further basis for irreparable harm: a small pool of standing water that has collected near Capitol View Library's entrance that they allege is dangerous for children. *See* Reply to Def. Opp. at 1-2; ECF No. 33-1; *see also* ECF No. 37-4. At oral argument, counsel for Executive Defendants explained that this is likely the result of a faulty sump pump, which is failing to adequately remove water from a bio-retention pond that was built to collect stormwater runoff.

Again, on the record here, any harm that might be suffered by Plaintiffs as a result of this small pool of water is highly speculative, as opposed to certain, actual, and imminent.  In addition, the requested relief will obviate little, if any, alleged harm connected to this pool.  As explained above, Plaintiffs must show that the harm will "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674.  But re-opening the Capitol View Library building—which has been issued a Certificate of Occupancy by the District of Columbia—will not substantially affect any speculative harm posed by the pool of water on its grounds. *See* ECF No. 27-20.  Finally, Plaintiffs' allegations concerning the pool were not pleaded in the amended complaint and do not appear connected to any of Plaintiffs' causes of action.  The Court "lacks jurisdiction over a motion when it 'raises issues different from those presented in the complaint.'" *Sai v. TSA*, 54 F. Supp. 3d 5, 9 (quoting *Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002)); *accord Stewart v. U.S. Immigration and Naturalization Serv*., 762 F.2d 193, 198-99 (2d Cir. 1985).

### C.       The Balance of the Equities and the Public Interest

In determining whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*  In this case, the balance of the equities and the public interest weigh strongly against injunctive relief.

In their motion, Plaintiffs argue that the public interest would be served by providing their community with much needed library resources, including computer resources.  Am. Mot. at 21-22.  But enjoining the re-opening of Capitol View Library would *prevent* the public from

having access to those resources. Indeed, upon re-opening, Capitol View Library is slated to become the first renovated or rebuilt DCPL branch to feature a dedicated computer lab for public technology training. Reyes-Gavilan Decl. ¶ 12. To date, DCPL has spent $4.5 million to renovate its interior. Def. Opp. at 33. And going forward, DCPL has included funding in its budget to more than double the number of computers in the lab (to forty-four) and to hire additional staff to manage computer services. Reyes-Gavilan Decl. ¶ 12. For these reasons, the balance of the equities and the public interest weigh strongly in favor of allowing Capitol View Library to re-open for the benefit of the entire neighborhood it serves, notwithstanding Plaintiffs' dissatisfaction with it.

Finally, the other relief sought by Plaintiffs, such as ordering additional resources for Capitol View Library, mandating that its windows be renovated in a particular manner, and requiring that Defendants incorporate Plaintiffs' input into the renovation process, would change, rather than maintain, the status quo, and therefore represents "an even more extraordinary remedy." *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013) (citations omitted).

More importantly, ordering such relief would plunge the Court into the political process through which the Mayor, the Council, and other public officials allocate limited resources for all residents of the District of Columbia. Ordering this relief would likely force them to reprogram funds designated for other projects, and could encourage piecemeal private litigation over the District of Columbia's budget. Especially on the record here, the balance of the equities and the public interest weigh strongly against this course, for which the Court is especially ill-equipped. *See, e.g., Nat'l. Wildlife Fed'n v. United States*, 626 F.2d 917, 924 (D.C. Cir. 1980) ("[T]he public interest dictates . . . restraint is necessary where, as here, [plaintiffs] ask us to intervene in wrangling over the . . . budget and budget procedures. Such matters are the archetype of those

best resolved through bargaining and accommodation between the legislative and executive branches.") (citation omitted).  And even assuming such a remedy could be justified, Plaintiffs have utterly failed to demonstrate how the public interest would be better served by awarding such relief now, through the extraordinary measure of preliminary equitable relief, as opposed to at the end of the case should they prevail.

## IV.     Conclusion and Order

For all of the above reasons, Plaintiffs' Motion for a Preliminary Injunction is **DENIED**.


**SO ORDERED.**


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 15, 2017