# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANCEL BELLINGER *et al.*,

    *Plaintiffs*,

  v.

MURIEL BOWSER *et al.*,

    *Defendants*.

Civil Action No. 17-2124 (TJK)

## MEMORANDUM OPINION AND ORDER

Plaintiffs Francel Bellinger and Iola Anyan (the "Individual Plaintiffs"), and Plaintiffs SE-NE Friends of the Capitol View Library and Marshall Heights Civic Association (the "Associational Plaintiffs"), have filed the instant action against various District of Columbia ("District") public officials for their alleged failure to provide Capitol View Library, a public library located in a predominately African-American neighborhood, with the same renovation funding and services provided to other public libraries in predominately white neighborhoods. Defendants Muriel Bowser, Gregory McCarthy, and Richard Reyes-Gavilan (the "City Defendants") have filed a motion to dismiss or, in the alternative, for summary judgment. ECF No. 45 ("City Defs.' MTD") at 1-2. The remaining Defendants, Vincent Gray, David Grosso, and Yvette Alexander (the "Council Defendants"), have filed a separate motion to dismiss. ECF No. 23. In response, Plaintiffs have moved to file a proposed second amended complaint and to conduct discovery. ECF Nos. 47, 66; *see also* ECF No. 47-2 ("PSAC"). The Court will grant Defendants' motions and dismiss the operative complaint for failure to state a claim. It will also deny Plaintiffs' motion to amend on the ground that the proposed amendments are futile, deny Plaintiffs' discovery motion as moot, and also deny Plaintiffs' request to file an untimely opposition, ECF No. 56, as moot. The reasons for doing so are set forth below.

## I. Procedural and Factual Background

Plaintiffs filed the instant action on November 6, 2017. ECF No. 1. That same day, they filed a motion for preliminary injunctive relief, ECF No. 4, which they later amended, ECF No. 19-1. The Council Defendants filed a motion to dismiss on November 29, 2017. ECF No. 23. On December 14, 2017, the Court held a hearing on the amended preliminary-injunction motion. The next day, the Court denied the motion. ECF No. 40; *Bellinger v. Bowser*, 288 F. Supp. 3d 71 (D.D.C. 2017). On January 12, 2018, the City Defendants filed a motion to dismiss or, in the alternative, for summary judgment. City Defs.' MTD. On February 9, 2018, Plaintiffs filed a motion to amend their complaint, ECF No. 47, and a motion to conduct discovery under Rule 56(d), ECF No. 66.

The Court discussed the factual background of this case in detail in its previous memorandum opinion and order denying Plaintiffs' motion for preliminary injunctive relief. *See Bellinger*, 288 F. Supp. 3d 71. The Court assumes the reader's familiarity with the background set forth in that opinion. The Court will discuss the particular factual allegations relevant to the instant motions below, keeping in mind that on a motion to dismiss under Rule 12(b)(6)—unlike the previous motion for injunctive relief—the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## II. Legal Standards

### A. Rule 12(b)(1)

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "plaintiffs bear the burden of establishing jurisdiction." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017). District courts "may in appropriate cases dispose of a motion to

dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). In such cases courts must, as when reviewing a Rule 12(b)(6) motion, "accept[] as true all of the factual allegations contained in the complaint." *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1157 (D.C. Cir. 2003). The Court may also rely, "where necessary," on "undisputed facts evidenced in the record." *Id.* at 1157 n.7.

### B. Rule 12(b)(6)

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint.'" *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.* "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### C. Rule 15(a)(2)

Under Federal Rule of Civil Procedure 15(a)(2), if a party may no longer amend his pleading as of right, then he "may amend [his] pleading only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires."

Fed. R. Civ. P. 15(a)(2).  However, "[c]ourts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss."  *Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016) (second alteration in original) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)).

## III.    Analysis

For the reasons set forth below, Defendants' motions will be granted, and Plaintiffs' motions will be denied.

### A.    Plaintiffs' Supplemental Opposition

As an initial matter, the Court will consider Plaintiffs' request that it accept an untimely opposition to the City Defendants' motion to dismiss.  Plaintiffs initially filed an opposition that largely failed to address the substantive issues the City Defendants had raised.  *See* ECF No. 48 (opposition); ECF No. 65-1 ("corrected" opposition).  The City Defendants argued that the Court should treat their arguments for dismissal as conceded.  ECF No. 53.  Plaintiffs then sought leave to file a new opposition responsive to the City Defendants' arguments.  ECF No. 56 (motion); ECF No. 57 ("Pls.' Supp. Opp.").  The City Defendants oppose granting leave to file the supplemental opposition.  ECF No. 61.

The Court will assume, for purposes of its analysis, that Plaintiffs' supplemental opposition was timely filed, and will consider the arguments included in it.  Ultimately, however, these arguments do not save Plaintiffs' claims, rendering the motion for leave to file irrelevant.  Therefore, the Court need not decide the merits of Plaintiffs' motion for leave to file a supplemental opposition, and will deny the motion as moot.

**B.     The City Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction under Rule 12(b)(1)**

The City Defendants have raised three challenges to the Court's subject matter jurisdiction under Rule 12(b)(1): that (1) the Associational Plaintiffs lack standing; (2) the political question doctrine bars Plaintiffs' claims; and (3) Count I of the Amended Complaint is not ripe. *See* City Defs.' MTD at 13-16. The Court will discuss each in turn.

First, the Court concludes that it need not resolve the City Defendants' challenge to the Associational Plaintiffs' standing. *See id.* at 13. Courts are generally required to address jurisdictional issues (such as standing) before reaching the merits. But that rule is relaxed where a challenge to standing takes aim at some, but not all, plaintiffs. "If constitutional standing 'can be shown for at least one plaintiff, [courts] need not consider the standing of the other plaintiffs to raise that claim.'" *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)). The City Defendants do not challenge the Individual Plaintiffs' standing. And as will be explained below, none of the Plaintiffs states a claim, so the Court need not consider an argument that some Plaintiffs lack standing.

Second, the political question doctrine is inapplicable because Plaintiffs' claims are levied against District of Columbia—as opposed to federal—officials. The City Defendants argue that funding appropriations are "the product of the District's annual budget process" and are thus an inherently political issue. *See* City Defs.' MTD at 13-15. But the political question doctrine limits federal courts' ability to decide issues committed to other branches of the *federal* government: it applies to "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of *Congress* or the confines of the *Executive Branch*." *Bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir.)

(emphases added) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)), *cert. denied*, 138 S. Ct. 480 (2017).  That is, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'"  *Baker v. Carr*, 369 U.S. 186, 210 (1962).  The District government is not a "coordinate branch[] of the Federal Government."  *Id.*  In fact, while the District of Columbia is in a strict sense a creature of the federal government, and is not a state, it is treated for most purposes as "'an independent political entity,' not a part of the federal government."  *Amiri v. United States*, 360 F. App'x 166, 167 (D.C. Cir. 2010) (quoting *Cannon v. United States*, 645 F.2d 1128, 1137 n.35 (D.C. Cir. 1981)).  Plaintiffs bring their claims against only District officials, not federal officials.  Thus, the City Defendants' "political question" argument does not affect this Court's subject matter jurisdiction.

Third, the City Defendants argue that Count I, brought under D.C. Code § 1-204.46, is not ripe.  *See* City Defs.' MTD at 15-16.  The ripeness doctrine "has both constitutional and prudential facets."  *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 978 (2018).  "Ripeness 'shares the constitutional requirement of standing that an injury in fact be certainly impending.'"  *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)).  In addition, courts "decide whether to defer resolving a case for prudential reasons by 'evaluat[ing] (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.'"  *Id.* (alteration in original) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).  Ripeness goes to whether the Court both can and should exercise jurisdiction.  *See id.* at 633 n.27.

Here, Count I is predicated on Plaintiffs' factual allegation that the District government did not spend $700,000 allocated by the City Council for interim services at Capitol View Library. *See* ECF No. 20 ("Am. Compl.") ¶¶ 32-34. The City Defendants explain that this allocation was made for the 2018 fiscal year, which does not end until September 30, 2018. City Defs.' MTD at 16. Thus, at least as of the filing of the City Defendants' motion, it was possible that the money would be spent as allocated. And the City Defendants represent that the District was, in fact, planning to spend the money on interim services in the spring of 2018. *Id.* Therefore, they argue, this claim is not ripe.

The Court concludes that Plaintiffs have conceded the ripeness issue as it pertains to Count I in their operative complaint. While parties cannot waive arguments challenging subject matter jurisdiction, "arguments *in favor of* subject matter jurisdiction *can* be waived by inattention or deliberate choice." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (emphases added). Here, Plaintiffs' supplemental opposition rests solely on the argument that their proposed second amended complaint cures any issues related to ripeness. They argue that their "amendments to the complaint seek to clarify that the complained of violations of District law are of such a character that [they] result in a constitutional violation." Pls.' Supp. Opp. at 6. The arguments that follow are devoted to the theory that the existence of a constitutional violation eliminates any potential concern about ripeness. *See id.* at 6-7. Count I of the proposed second amended complaint does, in fact, advance the theory that the violations of Section 1-204.46 amount to a due process violation. PSAC at 38. But the Amended Complaint—which is the operative complaint unless and until the Court accepts the proposed amendments—pleads Count I only under Section 1-204.46, without once mentioning the Constitution. *See* Am.

Compl. ¶¶ 30-36.  Therefore, Count I as pleaded in the Amended Complaint will be dismissed for lack of subject matter jurisdiction as unripe.

### C.      Defendants' Motions to Dismiss for Failure to State a Claim under Rule 12(b)(6)

The City Defendants have moved to dismiss or, alternatively, for summary judgment. City Defs.' MTD.  The Court concludes that summary judgment would be inappropriate at this juncture, because Plaintiffs have not yet had an opportunity for discovery.  *See Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012).  Therefore, the City Defendants' arguments on the merits will be examined under the standard for a motion to dismiss under Rule 12(b)(6).  The Court will limit its review to "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Thus, the Court will not consider the various declarations and other exhibits that the parties have filed in this case (except for any incorporated in the complaint).

The City Defendants' arguments, if correct, would warrant dismissal as to all Defendants. *See* City Defs.' MTD.  The Council Defendants have also moved to dismiss on grounds largely particular to them.  *See* ECF No. 23-1.  Because the Court concludes that the City Defendants have identified grounds to dismiss the entire Amended Complaint, the Court need not consider the Council Defendants' arguments.

### 1.      D.C. Code § 1-204.46 (Count I)

As explained above, Count I of the Amended Complaint will be dismissed on ripeness grounds.  But the Court notes that, even if it had jurisdiction over Count I, it would dismiss the claim under Rule 12(b)(6) for two reasons.  First, there is no private right of action to enforce D.C. Code § 1-204.46, the statute that Defendants allegedly violated.  Certainly, the statute does

not contain an express private right of action. And the "burden is on the plaintiff to demonstrate that the D.C. Council intended to imply a right of action." *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 226 (D.D.C. 2010). In its prior opinion, the Court concluded that Plaintiffs were not likely to meet this burden. *See Bellinger*, 288 F. Supp. 3d at 79-80. The Court now confirms that they have not. Indeed, Plaintiffs do not even attempt to meet this standard in their filings. *See* Pls.' Supp. Opp. at 6-7.[1]

Second, even if there were a private right of action, Plaintiffs have not alleged any violation of the "reprogramming" provision of Section 1-204.46(d). The operative complaint alleges that $700,000 was set aside for interim services in the FY 2018 budget, and that the District has not yet used those funds for that purpose. Am. Compl. ¶¶ 32-33. But that is not "reprogramming" as meant in the statute. While Section 1-204.46 does not itself define the term "reprogramming," another provision of District law does: it means "a budget modification of $500,000 or more for purposes other than those originally authorized that results in an offsetting reallocation of budget authority from one budget category to another budget category." D.C. Code § 47-361(14). That is, "reprogramming" does not mean a failure to spend funds, but a "reallocation" of funds from one part of the budget to another. As the City Defendants point out, there is no allegation that the $700,000 at issue was spent elsewhere or was otherwise improperly "reprogrammed." *See* City Defs.' MTD at 17.

---

[1] The Court notes that, notwithstanding the lack of a private cause of action, Plaintiffs may, in principle, seek review of a District agency's decision by invoking "the general equitable jurisdiction of the Superior Court." *E.g.*, *District of Columbia v. Sierra Club*, 670 A.2d 354, 359 (D.C. 1996). But here, Plaintiffs have not sought this form of review. *See* Pls.' Supp. Opp. at 6-7. Moreover, they seek money damages in connection with this claim, *see* Am. Compl. ¶ 36, which the Court cannot award absent a private right of action. *See Baumann*, 744 F. Supp. 2d at 227.

Therefore, even if it had jurisdiction, the Court would dismiss Count I for failure to state a claim.

### 2.  Equal Protection Clause (Count II)

Count II alleges that Defendants violated the Equal Protection Clause of the Constitution[2] by failing to provide Capitol View Library with renovations and related services of comparable quality and funding to those afforded public libraries serving predominantly white neighborhoods.  *See* Am. Compl. ¶¶ 37-45.  Plaintiffs claim this failure amounted to intentional racial discrimination: that Defendants "knowingly and intentionally create[d] the funding disparities in the renovation and operation" between Capitol View Library and other branch libraries serving white neighborhoods because the "racial makeup of the area served by Capitol View Library" is predominantly African-American.  *See id.* ¶¶ 38, 43-44.  The question before the Court is whether Plaintiffs' factual allegations are sufficient to carry this claim past the pleading stage.

Pursuant to longstanding Supreme Court precedent, intentional discrimination based on race, as opposed to a racially disparate impact, is required to make out an equal protection claim. That is, a plaintiff bringing an equal protection claim based on race must ultimately prove more than that a government policy had a greater impact on one racial group than it did on another. "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977).  Discriminatory intent "implies more than intent as volition or

---

[2] The Equal Protection Clause applies to the District of Columbia through the Fifth Amendment. *See Dixon v. District of Columbia,* 666 F.3d 1337, 1339 (D.C. Cir. 2011); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation omitted).

Of course, there often will not be direct evidence of intentional discrimination. Common sense suggests that government officials acting based on race may be reluctant to admit that they are doing so. As a result, plaintiffs bringing discrimination claims must often rely on circumstantial evidence of intent. And such circumstantial evidence can include the fact that a government action had a racially disparate impact. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. As part of this inquiry, the Court considers, among other things, (1) whether the impact of the action "bears more heavily on one race than another"; (2) the "historical background" of the decision, particularly if it demonstrates other actions taken for an invidious purpose; (3) any departures from normal procedures; (4) any "[s]ubstantive departures" from factors normally considered in reaching a decision; and (5) the legislative or administrative history of the decision. *Id.* at 266-68; *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 171, 184 (D.D.C. 2014), *aff'd on other grounds sub nom. Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36 (D.C. Cir. 2016).

On its own, however, evidence of disparate impact will seldom support an inference of intentional discrimination. "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of [a] state action," but the Supreme Court has held that "such cases are rare." *Arlington Heights*, 429 U.S. at 266. The Supreme Court has identified

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), as

archetypal examples of clear patterns demonstrating invidious discrimination.  *See Arlington*

*Heights*, 429 U.S. at 266.  In *Gomillion*, "a local statute altered the shape of a city from a square

to a 28-sided figure, which had the effect of removing from the city all but four of its 400

African American voters, and not a single white voter."  *In re Navy Chaplaincy*, 928 F. Supp. 2d

26, 34 (D.D.C.), *aff'd*, 738 F.3d 425 (D.C. Cir. 2013).  And in *Yick Wo*, "a city board of

supervisors denied building ordinance waivers to over 200 Chinese applicants, but granted

waivers to all but one non-Chinese applicant."  *Id.*  "Absent a pattern as stark as that in

*Gomillion* or *Yick Wo*, impact alone is not determinative . . . ."  *Arlington Heights*, 429 U.S.

at 266.

In this case, Plaintiffs assert a circumstantial case of intentional discrimination.  They

have not yet had the benefit of discovery that might allow them to flesh out their circumstantial

case.  Nonetheless, Plaintiffs are not entitled to discovery as of right.  In order to proceed to

discovery, Plaintiffs must allege facts that could plausibly support an inference of intentional

discrimination.

The Supreme Court famously provided guidance on how to evaluate a claim of

intentional discrimination at the pleading stage in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The

Court began by elucidating the general principles for determining whether plaintiffs have

adequately stated a claim.  It explained that "a sheer possibility that a defendant has acted

unlawfully" is not enough.  *Id.* at 678.  The court must be able to infer from the concrete facts in

the complaint that it is not merely possible, but "plausible" that the defendant is liable.  *Id.* at

679.  Of course, plausibility is not probability.  The court's role is not to evaluate the truth of the

plaintiff's factual allegations or to determine which party is likely to prevail.  *See id.* at 678.

Rather, the court must accept the plaintiff's "well-pleaded facts" as true, while setting aside "legal conclusions." *Id.* at 678-79. The court's role is to determine, based on "its judicial experience and common sense," whether the concrete facts alleged can support a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* That is, there must be facts that "nudge[]" the plaintiff's claim "across the line from conceivable to plausible." *Id.* at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The *Iqbal* Court applied these principles to the government's detention of Muslims after the terrorist attacks of September 11, 2001. The plaintiff alleged that "Arab Muslim men" had been singled out for lengthy and harsh detention on immigration charges based on their race, religion, and national origin. *Id.* at 667-69, 682. The Court concluded that the plaintiff had not plausibly alleged that these individuals were arrested or held based on their race or religion, because there was an "obvious alternative explanation": that the arrests and subsequent detention were part of a legitimate investigation into the attacks. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567). The attacks had been perpetrated by "Arab Muslim hijackers" belonging to an "Islamic fundamentalist group." *Id.* Thus, it was "no surprise" that a lawful investigation into individuals with "suspected links to the attacks would produce a disparate, incidental impact on Arab Muslims." *Id.* Plaintiffs had not alleged any facts that, in the face of this obvious and legitimate explanation, plausibly suggested "purposeful, invidious discrimination." *Id.*

*Smith v. Henderson*, 982 F. Supp. 2d 32 (D.D.C. 2013), offers a helpful counterpoint. That case concerned the closure of 15 District of Columbia public schools, all of them in "majority-minority neighborhoods east of Rock Creek Park," a part of the District where "residents are generally poorer and overwhelmingly black and Hispanic." *Id.* at 39. The government's stated reason for closing the schools was that they were "underenrolled," mostly

operating at less than 50% (and in some cases 25%) capacity. *Id.* Significantly, no schools in

majority-white parts of the city were closed. *See id.* The plaintiffs also pointed to the historical

fact that, in the 1970s, underenrolled white schools were allowed to stay open and be

"rehabilitated" "by busing in students from schools east of the Park." *Id.* at 40. The Court

determined that these allegations, while admittedly "slender," could nonetheless support a claim

of intentional racial discrimination at the motion-to-dismiss stage. *Id.* at 50. And they could

ultimately succeed only "if under-enrolled white schools have consistently been treated

differently from under-enrolled black schools, if the pattern is as stark as that in *Yick Wo* or

*Gomillion*, and if there is absolutely no race-neutral justification for the difference." *Id.* at 50-51.

Here, Plaintiffs have alleged a disparate impact based on the following facts:

- Capitol View Library, like two other libraries "located east of the Anacostia River in predominantly African-American neighborhoods," received less renovation funding than libraries in white neighborhoods did. Am. Compl. ¶¶ 17-18.

- Capitol View Library has an "opening [day] book collection" budget of only $50,000, at most half of the "average allocation of $100,000.00 - 150,000.00," and one-tenth the $500,000 opening-day book budget of Cleveland Park Library, located "in predominantly white Ward 3." *Id.* ¶ 28.

- Renovations to Capitol View Library did not include features that would have let in more natural light (specifically, larger windows and a glass door and wall), even though the District of Columbia Public Library ("DCPL") included these features in its renovation standards and provided them to Palisades Library, which is "located in an affluent, predominantly white" neighborhood. *Id.* ¶ 21.

- Capitol View Library did not receive interim services (that is, temporary library services at another facility pending completion of the renovation project) comparable to what other libraries in white, affluent neighborhoods received during the renovation process. *Id.* ¶¶ 23-27.

When examined carefully, these allegations, whether taken individually or together, simply

cannot support a plausible inference of intentional racial discrimination. Plaintiffs' allegations in

the complaint and the documents incorporated into it merely show that one library (and to a lesser extent, two other libraries) in a predominantly African-American area was treated less favorably than a few other libraries in the District—some of which are in predominantly white areas, and some of which are in predominantly African-American areas. In many ways, Capitol View Library simply appears to be an outlier. This is nothing like the pattern alleged in *Smith*, where 15 schools, all of them in majority-minority areas, were closed.

The Court starts with the alleged disparities among the various libraries' renovation budgets. The Amended Complaint refers to an "attached chart"[3] that "details the disparities" at issue. Am. Compl. ¶ 16. The chart includes the information summarized in Table A, below. The Court has rearranged the list to follow three groups of libraries that Plaintiffs identify in their complaint: (1) the Cleveland Park and Palisades Libraries located in majority (80%) white neighborhoods, (2) the Capitol View, Benning, and Anacostia Libraries located in heavily (around 95%) African-American neighborhoods east of the Anacostia River, and (3) the Lamond Riggs and Woodridge Libraries located in "Northeast DC." *Id.* ¶¶ 13, 18. Group (1) in Table A also includes Southwest Library, which is not discussed in the body of the complaint but is included in Plaintiffs' chart. *See* Pls.' Ex. C. Southwest Library is located in Ward 6,[4] which

---

[3] While there are no charts attached to the Amended Complaint, this appears to refer to a chart attached as Exhibit C to the original complaint. *See* ECF No. 1-4 ("Pls.' Ex. C"). Because the chart is referred to in the Amended Complaint and is integral to Plaintiffs' claim of disparate treatment, the Court may consider it on this motion to dismiss. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). The Court notes that some of this information (excerpted from a report on the proposed budget for the 2017 fiscal year) also appears in Exhibit B to the original complaint. *See* ECF No. 1-3 ("Pls.' Ex. B") at 3-5. This exhibit is also referred to, and relied upon, in the Amended Complaint. Am. Compl. ¶ 13.

[4] The Court takes judicial notice of the location of the Southwest Library. *See Adams v. Middlebrooks*, 640 F. App'x 1, 4 (D.C. Cir. 2016) ("[G]eographic location is a matter of which the courts may take judicial notice . . . .").

Plaintiffs' supplemental opposition identifies as a majority-white area.  Pls.' Supp. Opp. at 8.

(For economy of presentation, Table A does not include data in Plaintiffs' chart for the 2009 to

2011 fiscal years, which, upon review, does not alter the analysis set forth below.)

*Table A: Summary of 2012-2018 Library Renovation Budgets*

| Library | 2012 Budget | 2013 Budget | 2014 Budget | 2015 Budget | 2016 Budget | 2017 Budget | 2018 Budget (Projected) |
|---|---|---|---|---|---|---|---|
| *(1) Libraries in Majority-White Neighborhoods* | | | | | | | |
| **Cleveland Park** | $2,300,000 | $2,300,000 | $15,225,000 | $18,670,000 | $18,670,000 | $19,770,000 | $19,770,000 |
| **Palisades** | $2,965,000 | $2,965,000 | $21,700,000 | $21,700,000 | $7,191,745 | $7,191,745 | $7,191,745 |
| **Southwest** | $11,400,000 | $13,670,000 | $16,000,000 | $17,550,000 | $17,550,000 | $18,000,000 | $18,000,000 |
| *(2) Libraries East of the Anacostia River* | | | | | | | |
| **Capitol View** | $2,950,000 | $2,950,000 | $2,950,000 | $10,500,000 | $4,500,000 | $4,500,000 | $7,200,000 |
| **Benning** | $15,707,441 | $14,992,964 | —[5] | — | — | — | — |
| **Anacostia** | $14,741,204 | $15,501,008 | — | — | — | — | — |
| *(3) Libraries in Northeast DC* | | | | | | | |
| **Lamond Riggs** | $11,950,000 | $12,000,000 | $18,650,000 | $18,650,000 | $18,650,000 | $20,000,000 | $20,000,000 |
| **Wood-ridge** | $16,500,000 | $16,950,000 | $16,950,000 | $16,950,000 | $19,678,156 | $19,678,156 | $19,678,156 |

Pls.' Ex. C; *see also* Am. Compl. ¶ 18 (summarizing similar figures).

---

[5] These numbers appear to represent "lifetime budgets" for these projects, not the amounts spent in each fiscal year.  *See* Pls.' Ex. B at 3-5 (listing somes amounts in chart under heading of "lifetime budget authority").  It also appears that the blank entries for the Benning Library reflect the fact that all, or almost all, of the renovation budget was ultimately spent, not that the budget was cut.  *See* Pls.' Ex. B at 3, 5 (showing an "expenditure" of $14,863,896 dollars for the Benning Library as of June 2016).  Presumably, the blank entries mean the same for the Anacostia Library.

Plaintiffs' complaint draws two conclusions from these figures. First, it notes that the "highest point" of each library's budget was lower (to varying degrees) for each of the three libraries located in heavily (around 95%) African-American neighborhoods east of the Anacostia River: Capitol View Library's renovation budget was just over $10 million at its highest point, while the budgeted amounts for the Anacostia and Benning Libraries were both just over $15 million at their highest points. *See* Am. Compl. ¶¶ 13, 18. By contrast, the Cleveland Park and Palisades Libraries—located in neighborhoods that are 80% white—had maximum budgets of around $20 million and $22 million, respectively. *See id.* In addition, the two libraries in "Northeast DC"—the Lamond Riggs and Woodridge Libraries—had budgets of around $20 million each. *See id.* ¶ 18. Second, Plaintiffs point out that Capitol View Library's budget was decreased by over 50% in 2016, while Cleveland Park Library's budget was "left untouched." *Id.* ¶ 17.

But these select budget numbers do not demonstrate much without additional context. As the Court explained in its earlier opinion, Plaintiffs' comparison does not "account for non-racial differences among these renovation projects—such as the size of the library to be renovated and the number of items each circulates—that could explain [these] funding disparities." *Bellinger*, 288 F. Supp. 3d at 81. Indeed, it is inconceivable that library renovation budgets would not vary based on these or other legitimate factors. Moreover, Plaintiffs have chosen only a few of the libraries in the District's extensive library system as points of comparison. *See* Pls.' Ex. B at 4 (summarizing budget information for other libraries in the District). Their apparent decision to cherry-pick a few examples, as opposed to providing a more systemic analysis of how the District has deployed its library renovation resources, hinders their goal of alleging facts from which a plausible inference of intentional discrimination can be gleaned. *Cf. Spurlock v. Fox*,

716 F.3d 383, 391 (6th Cir. 2013) (noting in equal protection case that "the statistics emphasized on appeal by the parties" were not "particularly helpful because each party cherry picks *absolute* numbers that suit its own purpose"); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (noting proposed comparators in Title VII actions are less persuasive "to the extent . . . the plaintiff cherry-picks" them), *aff'd*, 553 U.S. 442 (2008).

Even aside from the lack of context, the budget numbers themselves are insufficient; they do not approach anything close to the type of pattern required to infer intentional racial discrimination. A cursory examination shows that the differences between libraries in different parts of the city are not as stark as Plaintiffs claim. While it is true that the Cleveland Park and Palisades Libraries had the largest budgets at their "highest points"—around $20 million dollars—the budgets for the Lamond Riggs and Woodridge Libraries were almost identical. The Court takes judicial notice of the fact that the latter two libraries are located in Ward 5, which had a population that was 76% African-American, according to the 2010 census. *See Adams*, 640 F. App'x at 4 ("[G]eographic location is a matter of which the courts may take judicial notice . . . ."); *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) (per curiam) ("United States census data is an appropriate and frequent subject of judicial notice."); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) ("[J]udicial notice may be taken of public records and government documents available from reliable sources."); Fed. R. Evid. 201.[6] And the Benning and Anacostia Libraries, both located in even more heavily African-American

---

[6] Relevant 2010 Census results for Ward 5 are maintained on the Government of the District of Columbia's Office of Planning website at: https://planning.dc.gov/node/597862. The Court notes that, according to Plaintiffs' proposed second amended complaint, the Lamond Riggs Library is located in Ward 4. PSAC ¶ 29. That is incorrect. While the Lamond Riggs Library is close to the borderline, a review of public records shows that it is located in Ward 5. And in any event, the same 2010 census results show that Ward 4 was 59% African-American.

neighborhoods east of the Anacostia River, also had substantial renovation budgets that each totaled about $15 million. Moreover, while Plaintiffs complain that Capitol View Library's renovation budget was decreased substantially in 2016, the budget for Palisades Library—located in a majority-white area—decreased by an even greater amount. And Capitol View Library's proposed budget for 2018 has been increased, such that it is now comparable to that of Palisades Library. When viewed together, these budget numbers do not give rise to a plausible inference of intentional racial discrimination against African-Americans. That distinguishes this case from *Smith*, in which a subset consisting of 15 District schools—all located in majority-minority areas—were shuttered entirely while others remained open. *See Smith*, 982 F. Supp. 2d at 39-40.

The same could be said of Plaintiffs' allegations about "opening [day] book collection" budgets for renovated libraries. Am. Compl. ¶ 28. They claim that Capitol View Library was allocated only $50,000 even though its book collection "has changed little since the library was opened in 1965." *Id.* By contrast, they point out, Cleveland Park Library had an opening-day book collection budget of $500,000. *Id.* But this sole one-to-one library comparison does not support a plausible inference of intentional racial discrimination. Plaintiffs do not, for example, allege that the book budgets for other libraries in predominantly African-American neighborhoods were unreasonably small. Nor do they effectively address obvious factors that might explain the differences between these two libraries. Plaintiffs allege that Capitol View Library's book collection is outdated, but they do not allege that other libraries have newer books. *See id.* Nor do they take into account the obvious fact that a larger library will require a bigger book budget. Moreover, Plaintiffs' preferred point of comparison—Cleveland Park Library's apparently outsize book budget—is not representative of other libraries in the system.

In Plaintiffs' own telling, the "average allocation" for libraries in the system was $100,000 to $150,000—significantly bigger than Capitol View Library's opening-day book collection budget, but also nowhere near Cleveland Park Library's. *Id.*

Similarly, the Court cannot conclude that Plaintiffs have adequately alleged a claim for intentional racial discrimination by their assertion that Capitol View Library, unlike Palisades Library, was not furnished with larger windows and glass doors and walls during the renovation. *See* Am. Compl. ¶ 21. It will not do to pick out a single feature present in one library, and missing from one other, and claim on that basis that the District intentionally discriminated against African-Americans. There could be any number of reasons why one library has larger windows and another does not. And while these two libraries may have different windows, they are similar in other ways: both libraries have similar proposed renovation budgets as of the 2018 fiscal year, and both saw substantial budget cuts in 2016. *See supra* tbl.A; Pls.' Ex. C.

Nor is there any plausible inference of intentional racial discrimination from the alleged disparities regarding "interim services" provided by the District once library renovations were underway. Plaintiffs claim that "Capitol View has not received *any* interim services for the *entire time* it has been closed." Am. Compl. ¶ 23 (emphases added). As an initial matter, their own complaint reveals that this is an exaggeration: the District "provided additional services in the form of additional librarians for book borrowing at J.C. Nalle, a local elementary school." *Id.* ¶ 14. While Plaintiffs claim that "these measures did not begin to meet the community's need for interim services," *id.*, they were certainly more than nothing. In addition, the District tried to make up for these deficiencies in other ways: "instead of providing interim services," it decided to "open Capitol View [Library] with limited services while the proposed renovation was

completed." *Id.* ¶ 27.  This too Plaintiffs found unsatisfactory, but it cuts against their theory of total neglect by the District government.

More critically, other facts alleged in the complaint neutralize any inference of discrimination from the deficient interim services.  Exhibit B to Plaintiffs' original complaint contains a summary of Plaintiff Anyan's testimony at a public meeting regarding the library renovations.  Pls.' Ex. B.[7]  She requested "interim services like a mobile trailer, which was provided for the residents using the Anacostia and Southeast libraries at Eastern Market." *Id.* at 2.  In Plaintiffs' account, the Anacostia Library is a comparable library "located east of the Anacostia River in [a] predominantly African-American neighborhood[]." Am. Compl. ¶ 18.  Thus, the very interim services that Plaintiffs claim they were denied on a discriminatory basis were in fact provided in another area with an overwhelmingly African-American population.

Even taken together, all of these alleged disparities affecting Capitol View Library—to the extent they can even be characterized as showing a racially disparate impact—simply cannot support a plausible inference of intentional racial discrimination.  Plaintiffs undoubtedly want more money for their neighborhood library.  But their allegations, even evaluated at the pleading stage, come nowhere close to cases like *Yick Wo* or *Gomillion* in which a racial disparity was so stark that it permitted an inference of intentional discrimination.  The question, then, is whether Plaintiffs plead any other facts suggesting these disparities were in fact the result of intentional racial discrimination.

Plaintiffs do put forth additional allegations that, in their telling, represent a departure "from the 'normal procedural sequence'" and "'substantive departures' from factors normally

---

[7] Not only is this testimony incorporated by reference into the Amended Complaint, but Plaintiffs also affirmatively rely on it for the truth of the matters asserted.  *See* Am. Compl. ¶ 13.

considered in reaching a decision"—either of which can contribute to a circumstantial case of racial discrimination. *Kingman Park*, 27 F. Supp. 3d at 184 (quoting *Arlington Heights*, 429 U.S. at 267); *see* Pls.' Supp. Opp. at 7-8. Specifically, they allege that the District handled the renovation in a procedurally defective way: it was "piecemeal," marked by a lack of "transparency," and "wrought with inconsistencies." *E.g.*, Am. Compl. ¶¶ 21, 25, 29, 41. But while Plaintiffs claim that these problems ran "contrary to the renovation process of other libraries in the District of Columbia," *id.* ¶ 41, they have not identified any particular library that had a different or better experience. And "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, suggest that the problems they have identified are not out of the ordinary. It is certainly unfortunate that, in Plaintiffs' view, District officials have failed to adequately respond to their needs and broken promises to their neighborhood. But nothing Plaintiffs describe goes beyond the dissatisfaction that many citizens experience when advocating for local public-works projects. Such routine frustrations, without more, do not permit an inference of racial discrimination.

A prime example is Plaintiffs' allegation that the District violated its "own standards" by refusing to enlarge the windows in the library. Am. Compl. ¶ 25. Plaintiffs have attached a "building program" for Capitol View Library as Exhibit H to their original complaint,[8] and it does indeed reference the importance of "windows that attract the attention of people passing by" and allow "the public using the library to look out." ECF No. 1-9 at 11. But this document, on its face, is only to be used "as a *guide*," and its "requirements need to be adjusted to fit within the envelope of the existing library while meeting the budget and adhering to all code required upgrades." *Id.* at 4 (emphasis in original). The District's failure to provide attractive windows

---

[8] Here too, this document is referenced in the Amended Complaint. *See* Am. Compl. ¶ 21.

was surely a disappointment to Plaintiffs.  Nonetheless, it was hardly a procedural or substantive irregularity of the sort that could support an inference of racial discrimination.

At the end of the day, Plaintiffs' claim of discrimination does not pass muster because there are "obvious alternative explanation[s]" for the deficiencies relating to Capitol View Library that they have identified.  *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). The simple fact is that budgets for public-works projects might vary for any number of perfectly legitimate reasons, such as budgetary constraints, the size of the library, the scope of the renovation project, and the needs of each local population (including whether other libraries nearby can provide some of the same services).  And in fact, budget disparities can sometimes be explained by questionable reasons (such as backroom dealmaking) that—however unsavory— have nothing to do with race.  That is why disparities like the ones Plaintiffs have identified— which do not represent anything close to a "stark" pattern of racially disparate treatment, *Arlington Heights*, 429 U.S. at 266—are insufficient to allege a case of intentional racial discrimination.

Faced with so many possible explanations for the alleged deficiencies with Capitol View Library's renovation, Plaintiffs' challenge in this case is to identify facts that make intentional racial discrimination stand out, "nudg[ing]" that particular explanation "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).  They have not done so.  To the contrary, as explained above, many facts in the complaint undercut the claim that any alleged disparities resulted from racial discrimination.  Beyond the alleged disparities themselves, Plaintiffs have alleged only their frustration with the municipal bureaucracy, which is hardly out of the ordinary.  That is not enough to support a plausible inference of intentional discrimination.

Therefore, Count II of the Amended Complaint must be dismissed.

### 3.    Equal Protection – Rational Basis (Count III)

Count III alleges a "Violation of Due Process – Rational Basis." Am. Compl. at 13. The Court previously interpreted Count III as bringing a substantive due process claim. *See Bellinger*, 288 F. Supp. 3d at 85-86. Plaintiffs now assert in their supplemental opposition that Count III "does not raise a claim of substantive due process but raises an alternative theory of equal protection on a 'rational basis theory.'" Pls.' Supp. Opp. at 14; *see also Nat'l Ass'n for Advancement of Multijurisdiction Practice v. Howell*, 851 F.3d 12, 18 (D.C. Cir.) (In the equal protection context, if defendant's alleged action "does not infringe a fundamental right or disadvantage a suspect class, no more than rational basis review is required."), *cert. denied*, 138 S. Ct. 420 (2017). Count III of the Amended Complaint does not once mention equal protection. *See* Am. Compl. ¶¶ 46-50. But even if it does advance an equal-protection theory, it fails to state a claim.

The rational-basis test applies when a plaintiff challenges a government's decision to treat one class of people differently from others, and the classification "neither proceeds along suspect lines nor infringes fundamental constitutional rights." *Hettinga v. United States*, 677 F.3d 471, 478 (D.C. Cir. 2012) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Courts apply it with particular deference in the context of "local, economic, social, and commercial" policy. *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012). Under this deferential rational-basis review, the government will prevail if "there is a *plausible* policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Id.* (emphasis added) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11

(1992)).  "The challenger bears the burden of showing that the [classification] is not a rational means of advancing a legitimate government purpose."  *Hettinga*, 677 F.3d at 478-79.  That burden requires the challenger "to negative every conceivable basis which might support [the classification], whether or not the basis has a foundation in the record."  *Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010) (quoting *Steffan v. Perry*, 41 F.3d 677, 684 (D.C. Cir. 1994) (en banc)) (internal quotation marks omitted).  "Even at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'"  *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin v. Sec'y of Health & Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)).

Here, Plaintiffs complain that, "contrary to every other library renovated by DCPL[,] Capitol View's funding stream has been far less than any other library."  Pl.'s Supp. Opp. at 15.  Thus, the "classification" at issue appears to lie between persons living near Capitol View Library and those living near other libraries in the District.  The question before the Court, then, is whether the facts in the complaint support an inference that there was no *plausible* policy reason for the alleged fact that the District devoted fewer resources to the renovation project at Capitol View Library relative to similar projects at other District libraries.  It is not difficult for the Court to conclude that the allegations do not support such an inference.  As mentioned above, there are many legitimate reasons why one library renovation project might proceed under a different budget, with different interim services, and at a different pace than another.  The City Defendants' motion papers suggest just a few:

> The decision to fund an interim library facility depends on the project budget, the amount of time the branch is expected to close for construction, and the community's proximity to other public libraries; opening day funding is determined by the amount of

> "refreshing" a library's collection requires upon reopening, a product of the duration [for which] the library was closed and the number of items it typically circulates; and differences across capital improvement budgets are logically traced to the scope of work required, or the total amount of funding available in a given fiscal year, or numerous other obvious, rational, non-discriminatory factors.

City Defs.' MTD at 30-31.

The City Defendants also explain how these factors applied to some of the alleged issues affecting Capitol View Library. Plaintiffs complain about the overall budget and pace of the renovation. Am. Compl. ¶ 47. The City Defendants rightly respond that—as already established above—Plaintiffs' own figures show that Capitol View Library's budget, while smaller than the budgets of some projects, is similar to others (such as Palisades Library's budget). City Defs.' MTD at 25-26. They also explain that the library's renovation emerged from a rational process that involved consultation with the community and contractors, and that the project's budget has changed over time in response to the needs of the project and the city's overall budget. *Id.* at 7-9. This process included due consideration of the need for interim services, and the City Defendants explain that they attempted to provide these services. *Id.* at 9. Indeed, some of their efforts are recounted in the complaint itself, which notes that the District tried to establish interim services at a nearby church but ultimately was unable to do so. Am. Compl. ¶ 23. And as the Court noted in its previous opinion, there are other potential reasons for the lack of interim services, including that Capitol View Library is only a mile away from Benning Library. *See Bellinger*, 288 F. Supp. 3d at 83.

Plaintiffs also point to the fact that Capitol View Library had an opening day book budget of only $50,000, while Cleveland Park Library had a budget of $500,000. Am. Compl. ¶ 49. But the City Defendants explain that "[l]ibraries with high circulation rates require more one-time collections funding after periods of closure, especially if they were closed for a longer

time." City Defs.' MTD at 6-7. Here, the City Defendants assert, Cleveland Park Library has a much larger circulation (over 200,000 items) than Capitol View Library (around 33,000 items), and it was scheduled to close for a much longer time (two years) than Capitol View Library (nine months). *Id.* at 7.

Of course, the Court cannot evaluate on a 12(b)(6) motion whether Defendants' proffered explanations are the real reasons behind the District's decisions about the library. But for purposes of a rational-basis analysis, it does not matter whether the proffered reasons are true—it only matters whether they could rationally advance a legitimate government interest. *See Armour*, 566 U.S. at 681. Plaintiffs assert in conclusory fashion that the alleged deficiencies in Capitol View Library's renovation "cannot be related to any legitimate government interest." Am. Compl. ¶ 50. But they have not provided facts that could plausibly exclude the District government's proffered explanations, all of which could easily have been anticipated from the general allegations in the complaint. Thus, even on a 12(b)(6) motion, the Court must "accept [Defendants'] explanation[s] and end [its] inquiry here." *Hettinga*, 677 F.3d at 479.

Therefore, Count III of the Amended Complaint must be dismissed.

### 4. District of Columbia Human Rights Act (Count IV)

Count IV alleges that Defendants discriminated against Plaintiffs on the basis of their place of residence, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq. See* Am. Compl. ¶¶ 51-53. In its prior opinion, the Court explained why this claim fails as a matter of law. *Bellinger*, 288 F. Supp. 3d at 86-88. The outcome is no different here, even though the record is more confined than on the previous motion. Indeed, a key case that the Court relied on in its prior opinion, *Boykin v. Gray*, 895 F. Supp. 2d 199 (D.D.C. 2012), was also decided on a Rule 12(b)(6) motion. *See id.* at 204-05, 218. Plaintiffs rely principally on a legal argument analogizing this case to *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33 (D.D.C.

2003). *See* Pls.' Supp. Opp. at 3-4. The Court previously rejected this argument, *see Bellinger*, 288 F. Supp. 3d at 87-88, and it fares no better now.

Therefore, Count IV of the Amended Complaint must be dismissed.

*        *        *

For the reasons stated above, the Court will dismiss the Amended Complaint for failure to state a claim, and (with respect to Count I) for lack of subject matter jurisdiction.

### D.        Plaintiffs' Motion to Amend

Plaintiffs have filed a proposed second amended complaint that seeks to bolster, and in some instances reframe, Counts I-IV. *See* ECF No. 47-1 ("Am. Mot."); PSAC. It also adds a new Count V, which relates to a pool of water that has collected outside Capitol View Library. PSAC ¶¶ 116-120. Both the Council Defendants and the City Defendants oppose, arguing, among other things, that granting leave would be futile. *See* ECF No. 51; ECF No. 52 ("City Defs.' Am. Opp.").

"A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga*, 677 F.3d at 480. To determine whether filing the proposed second amended complaint would be futile, the Court must ask two questions. First, do Plaintiffs' new allegations resurrect Counts I through IV, which have been dismissed? Second, does Plaintiffs' new Count V state a claim?

The Court concludes that the answer to both questions is "no," and so it will deny leave to amend.

#### 1.        Revisions to Counts I-IV

##### a.        Count I

The allegation at the heart of Count I of the PSAC is the same as in the Amended Complaint: that Defendants improperly "reprogrammed" funds meant for interim services, in

violation of D.C. Code § 1-204.46.  PSAC ¶¶ 90-96.  Plaintiffs now add, however, a claim that this same conduct also violates their substantive due process rights under the Constitution.  *Id.* at 38.

But "substantive due process" is not a philosopher's stone that can transmute Plaintiffs' defective statutory claim into a constitutional violation.  To make out a substantive due process claim, a plaintiff must prove that "egregious government misconduct" deprived them of a constitutionally recognizable liberty or property interest.  *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206, 209 (D.C. Cir. 2003).  Plaintiffs have not alleged any such interest or any egregious government misconduct.

First, Plaintiffs fail to allege that they have a property or liberty interest at stake.  Property interests "are not created by the Constitution," *Del. Riverkeeper Network v. FERC*, 895 F.3d 102, 108 (D.C. Cir. 2018) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)), but instead are defined "by existing rules or understandings that stem from an independent source such as state law," *id.* (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).  A property interest must rest on "a legitimate claim of entitlement" to a government benefit, as opposed to a mere "abstract need or desire" or "unilateral expectation." *Id.* (quoting *Castle Rock*, 545 U.S. at 756).  Here, Plaintiffs have identified no provision of District of Columbia law—or any other law—that entitles them to interim library services.

And in any event, Plaintiffs have not shown any egregious government misconduct.  As explained above, Plaintiffs have not even pleaded a violation of the statute they cite.  Therefore, the proposed amendments to Count I are futile.

### b.    Count II

Many of Plaintiffs new allegations in the PSAC are an effort to bolster Count II with a "more refined analysis" of the statistical evidence comparing library renovation budgets in

different District wards.  Am. Mot. at 14; *see id.* at 12-20 (summarizing allegations).  As the City

Defendants point out, all of this information was available when Plaintiffs filed the operative

complaint.  *See* City Defs.' Am. Opp. at 2-3; *Hajjar-Nejad v. George Wash. Univ.*, 873 F. Supp.

2d 1, 12 (D.D.C. 2012) (denying leave to amend where proposed revision "relate[d] to conduct

of which the plaintiff should have been aware at the inception of the action").  In any event, none

of these new allegations changes the Court's conclusion that Plaintiffs have failed to state an

equal protection claim.

      Plaintiffs' proposed amendments slice up the District-wide library budget numbers in

new ways.  They now separate the data by ward, and take into account the number of libraries in

each ward.  *See* PSAC ¶ 24.  They also divide up the "capital budget" for each ward among three

types of projects: "new build or new addition" projects, "renovation only" projects, and "refresh

or improvement" projects.  *Id.*

      Unfortunately for them, the results of this analysis are not particularly helpful to their

claims.  Plaintiffs focus on the combined budget for "renovation only" and "new build" projects

(while excluding "refresh or improvement" projects).  *See id.* ¶¶ 24-30.  They describe the

resulting calculation as representing the "overall" capital budget.  *Id.* ¶ 24, at 8.  Plaintiffs

conclude that each ward, on average, received about $15.6 million per library in terms of the

"overall" capital budget.  *See id.* ¶ 25.  Wards 7 and 8, "both located East of the Anacostia

River" with a ">90% black majority," *id.* ¶ 45, had "overall" capital budgets of $11.1 million

(the lowest of all eight wards) and $15.3 million per library, respectively, *id.* ¶ 25.  Moreover, the

ward with the highest "overall" capital budget per library was Ward 5, which, as noted above,

had a population that was 76% African-American as of the 2010 census.  *Id.*; *see also id.* ¶ 49

(explaining that "wards like 4 and 5 still have a majority black population," although their white,

Asian and mixed-race populations are increasing).[9]  In short, the analysis shows that some

libraries in predominantly African-American areas (like Ward 7) had below-average "overall"

capital funding, some (like Ward 8) had average funding, and some (like Ward 5) had above-

average funding.  This does nothing to advance Plaintiffs' claims of intentional racial

discrimination.  In fact, it undermines them.

Plaintiffs perform a similar "per-library" analysis for just the "new build" projects.  *See*

PSAC ¶¶ 32-36.  Once again, the results are similar: Ward 7 had below-average funding, Ward 8

had funding that is closer to the average (although still slightly below average), and Ward 5 (with

a predominantly African-American population) had notably above-average funding.  *See id.*  And

once again, these results do not meaningfully advance Plaintiffs' claims.

Just a glance at Plaintiffs' charts representing these analyses (reproduced, with different

shading, below as Figures A and B) belies the existence of any stark pattern of racial

discrimination:

---

[9] As noted above, Plaintiffs appear to have erroneously excluded the Lamond Riggs library from their Ward 5 calculations.  *See* PSAC ¶ 29; *supra* note 6.  Nonetheless, the Court accepts Plaintiffs' calculations as true.

*Figure A: Plaintiffs' Chart of Average "Overall" Capital Budgets per Library by Ward*



PSAC ¶ 36, at 15.



PSAC ¶ 36, at 14.

Plaintiffs also make new allegations regarding "gentrification," specifically how racial demographics and income inequality have changed in the eight wards over time. *See id.* ¶¶ 41-50. As the Court previously explained, however, "development and gentrification are not at issue here," and general evidence about gentrification "says nothing about the 'historical background' related to the funding of DCPL's branch libraries, which, as discussed above, is not helpful to them." *Bellinger*, 288 F. Supp. 3d at 84. Plaintiffs simply do not link these general facts about inequality in the District to the actual issue at hand, which is the funding for District libraries and Capitol View Library in particular.

Plaintiffs also add new allegations regarding Palisades Library, located in "predominantly white Ward 3," as a potential "comparator" to Capitol View Library. PSAC ¶ 62. As Plaintiffs acknowledge, the Capitol View and Palisades Libraries have renovation budgets with "similar dollar amounts." *Id.* ¶ 64. But Plaintiffs claim this similarity obscures other indicia of favorable treatment for the community surrounding Palisades Library:

- The community surrounding Palisades Library was initially offered a new library with a budget of over $21 million, but turned it down in favor of renovating the existing library for a lower amount. The Capitol View community never received a comparable offer. *Id.* ¶ 63.

- Palisades Library has a "'robust' children's section," whereas the "comparable space at Capitol View Library has gone under-utilized because of neglect, sitting empty and used for Zumba classes two times a week or the occasional community meeting." *Id.*

- Capitol View Library required asbestos abatement work, whereas "there is no indication that Palisades needed similar work." *Id.* ¶ 64. "[O]ther libraries that required abatement of hazardous materials received funding amounts higher than Capitol View . . . ." *Id.*

- Palisades Library's "renovation will be completed in less than 1 year." *Id.* ¶ 65. By contrast, exterior renovations at Capitol View Library will not be complete by the time it reopens, exposing the community to "obvious noise disturbances and inconveniences." *Id.*

- Palisades Library received new windows and a glass entranceway, while Capitol View Library did not. *Id.*

- Palisades Library received the same $50,000 "opening [day] book collection" as Capitol View Library did, but it "started with a large collection" of "over 70,000 items" and "over a hundred periodicals." *Id.* ¶ 79. By contrast, Capitol View Library has around 38,000 books, a large number of which were loaned out to other libraries. *Id.* ¶ 80. It also has the capacity to hold up to 100,000 books, most of which is unused. *Id.* ¶ 83.

These allegations have some force in showing that Capitol View Library has gotten less attention than Palisades Library: it has received the same renovation budget as Palisades Library, even though it may need more work. But Plaintiffs fail to connect this observation about Capitol

View Library to a larger point about discrimination against African-Americans. As discussed above, Plaintiffs' statistical allegations tend to undercut the idea that predominantly African-American areas have received inferior library services. In effect, Plaintiffs have shown that Capitol View Library was treated worse than libraries in predominantly white areas (such as Palisades Library in Ward 3) *and* other libraries in predominantly African-American neighborhoods (such as the libraries in Ward 8). So while their allegations suggest that Capitol View Library may have been treated less favorably than many libraries, they do not suggest that the reason is intentional racial discrimination.

Finally, Plaintiffs provide additional details about Capitol View Library's allegedly deficient interim services and book collection budget. *See id.* ¶¶ 69-84. These allegations do not materially add to those in the Amended Complaint, discussed above.

When all is said and done, Plaintiffs' PSAC does not advance this claim past the premise that *one* library in a predominantly African-American neighborhood received a less robust renovation than other libraries in the District of Columbia. It has not alleged a larger pattern in which libraries in African-American neighborhoods have been treated poorly. To the contrary, Plaintiffs' own data seems to show that other libraries in African-American neighborhoods have been treated comparably to libraries in white neighborhoods. That is not enough to plausibly allege intentional racial discrimination. Therefore, the proposed amendments in support of Count II are futile.

### c. Counts III and IV

Counts III and IV can be dealt with summarily. The Court has reviewed Plaintiffs' proposed amendments and concludes that they do not affect the analysis, set forth above, for why Counts III and IV must be dismissed. Therefore, any amendments to these claims are futile.

## 2. Count V

Count V is new. It relates to an "underground stream bubbling up close to the main entrance of the library." PSAC ¶ 85. "It is unclear where the water is going, or what its source might be." *Id.* ¶ 87. Plaintiffs assert that the water "is a potential source of danger to youth visiting the library." *Id.* They claim that it is visually unappealing as well, contributing to the "drab and dismal appearance" of the library's exterior. *Id.* It has also leaked into the library on at least one occasion, "causing evacuation of the library." *Id.* ¶ 119.

More to the point, Plaintiffs assert that this water is an environmental problem. They allege that, prior to the library's opening, "[n]o environmental impact study had been submitted or executed as to this newly found stream." *Id.* ¶ 88. As a result of the stream, a pool of excess water—which District officials describe as a "biopool"—has gathered next to the library. *Id.* ¶ 86. Plaintiffs themselves claim that "the exact legal and/or biological/environmental definition of a 'biopool' is still unclear." *Id.* ¶ 89. They describe this "biopool" as a large "ditch" that is "approximately 30 feet by 10 feet wide by 3-4 feet deep." *Id.* And "the proposed 'biopool' has not been studied as to its effects on the existing ecosystems." *Id.* ¶ 86.

All this, Plaintiffs claim, violates the District of Columbia Environmental Policy Act of 1989, D.C. Code § 8-109.01 *et seq.* PSAC ¶¶ 116-120. The Act requires the preparation of an environmental impact statement "[w]henever the Mayor or a board, commission, authority, or person proposes or approves a major action that is likely to have substantial negative impact on the environment, if implemented." D.C. Code § 8-109.03(a). An "action" is "a new project or activity directly undertaken by the Mayor or a board, commission, or authority of the District government," or "a project or activity that involves the issuance of a lease, permit, license, certificate, other entitlement, or permission to act by an agency of the District government." *Id.* § 8-109.02(1). A "major action" includes "any action that costs over $1,000,000 and that may

have a significant impact on the environment," as well as certain actions costing less than $1 million where prescribed by regulation. *Id.* § 8-109.02(2).[10] The regulations require an impact screening form to be filed for an "action" costing less than $1 million "if the action imminently and substantially affects the public health, safety, or welfare." D.C. Mun. Regs. tit. 20, § 7021.3. Actions that "imminently and substantially" affect the public health include those that "would create a public health hazard under applicable District regulations." *Id.* § 7021.4(d).

As the City Defendants argue, Plaintiffs have not pleaded a violation of the statute for a number of reasons. *See* City Defs.' Am. Opp. at 8-10. First, Plaintiffs have not alleged an "action" that would require an environmental impact statement. Rather, they allege inaction. Their claim is that the District "contemplates a major action by keeping the library open without a full understanding of the potential impact of an environmental hazard." PSAC ¶ 120. That is, after becoming aware of the pool of water, District officials allegedly paused for "further review before they would be able to make any determination as to what course of action should be taken." *Id.* ¶ 118. But this wait-and-see approach cannot be construed as "a new project or activity directly undertaken" by District officials. D.C. Code § 8-109.02(1).[11]

Second, they have not pleaded a "major" action. They do not allege that the cost of the biopool exceeds $1 million. Plaintiffs suggest that the total budget for the renovation of Capitol

---

[10] The statute further specifies that the "cost level of $1,000,000 shall be based on 1989 dollars adjusted annually according to the Consumer Price Index." D.C. Code § 8-109.02(2). The City Defendants represent that this amount, in today's dollars, is approximately $2 million. City Defs.' Am. Opp. at 9. While recognizing that the actual amount is higher, the Court will simply refer to the statutory amount of $1 million.

[11] Plaintiffs come closest to alleging "action" when they cite the District's assertion that it "has begun the synthesis of a 'biopool.'" PSAC ¶ 86. But they effectively reject any possible characterization of such a "synthesis" as "action" on the part of the District when they assert that the "biopool" is merely the result of water "bubbling" up through the ground from an unknown source and into a preexisting ditch. *Id.* ¶ 89.

View Library satisfies this requirement.  *See* ECF No. 58 at 19-20.  But the library renovation is not the relevant "action": Plaintiffs themselves allege that the source of the pool is "unclear," not that it is a result of the renovation project or that it was foreseeable at the time the renovations were approved.  PSAC ¶ 87.  And while Plaintiffs do allege that the biopool is a "hazard" that poses "a potential source of danger to youth visiting the library," PSAC ¶¶ 87, 120, they have not explained how it is a "public health hazard" under applicable District of Columbia regulations. *See* D.C. Mun. Regs. tit. 20, § 7021.4(d).

Plaintiffs also assert in passing that Defendants' actions "violate due process of law." PSAC ¶ 120.  Once again, though, a bare invocation of "due process" cannot convert an alleged state law violation into a constitutional claim.

*          *          *

For all of the foregoing reasons, Plaintiffs' motion for leave to amend will be denied.

### E.    Discovery

Finally, Plaintiffs have requested discovery.  ECF No. 66.  Given that their claims have been dismissed, this request will be denied as moot.

## IV.    Conclusion and Order

For the reasons set forth above, the Court hereby **ORDERS** that Defendants' motions to dismiss (ECF Nos. 23 and 45) are **GRANTED**, Plaintiffs' Second Motion to Amend (ECF No. 47) is **DENIED**, and Plaintiffs' Motion for Discovery (ECF No. 66) and Motion to File their Opposition Out of Time (ECF No. 56) are **DENIED AS MOOT**.

While the Court has already denied Plaintiffs' request for leave to amend, the Court will allow Plaintiffs, if they wish, to file another motion for leave to amend by **October 19, 2018**. If Plaintiffs choose not to do so, the Court will enter a final order dismissing the action.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 30, 2018